IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| BRYAN S. MICK, Personal Representative of the Estate of PRINT ZUTAVERN, Deceased,<br><br>                                  Plaintiff,<br><br>        vs.<br><br>DEPUTY BARRETT GIBBONS, in his individual and official capacities; DEPUTY LAWRENCE STUMP, in his individual and official capacities; SHERIFF DAN OSMOND, in his individual and official capacities; COUNTY OF CUSTER, a Nebraska political subdivision, d/b/a CUSTER COUNTY SHERIFF'S OFFICE; TRP. SAM MORTENSON, in his individual and official capacities; SGT. MATT WORKMAN, in his individual and official capacities; LT. TIM ARNOLD, in his individual and official capacities; TRP. TREVINO, in his individual and official capacities; TRP. LEVI COCKLE, in his individual and official capacities; TRP. BRANDON WILKE, in his individual and official capacities; CPT. TYLER SCHMIDT, in his individual and official capacities; and JOHN/JANE DOE, a training supervisor of the Nebraska State Patrol, in his/her individual and official capacities,<br><br>                                  Defendant. | Case No. 4:22-cv-3025<br><br><br><br>**COMPLAINT, JURY DEMAND AND DESIGNATION OF PLACE OF TRIAL** |

Bryan S. Mick, Personal Representative of the Estate of Print Zutavern, Deceased, for his

cause of action against Defendant, states as follows:

**PARTIES, JURISDICTION AND VENUE**

1.

Bryan S. Mick is the duly-appointed Personal Representative of the Estate of Print Zutavern,

Deceased.  He is a citizen and resident of Douglas County, Nebraska.

2.

The Custer County Sheriff's Office is a Nebraska political subdivision.  At all relevant times, Dan Osmond was the Custer County Sheriff, and Lawrence Stump and Barrett Gibbons were two of his deputies.  OSMOND, STUMP and GIBBONS are citizens and residents of Custer County, Nebraska, and are all sued in their individual and official capacities.

3.

At all relevant times, Trp. Sam Mortenson, Sergeant Matt Workman, Lt. Tim Arnold, Trp. Trevino, Trp. Levi Cockle, Trp. Brandon Wilke and Cpt. Tyler Schmidt were employees and law enforcement officers of the Nebraska State Patrol.  All are sued in their individual and official capacities.  So, too, is John/Jane Doe, a training supervisor of the Nebraska State Patrol whose name is presently unknown but who designed, directed and provided training to the before-named troopers and officers of the Nebraska State Patrol on the subject of encounters with seriously mentally ill and barricaded subjects.

4.

SCHMIDT and MORTENSON were assigned to Troop D of the Nebraska State Patrol, headquartered in North Platte.  MORTENSON is a certified crisis negotiator.  SCHMIDT is a captain and a supervisor.

5.

WORKMAN is a dog handler assigned to Troop H of the Nebraska State Patrol, headquartered in Lincoln, and is a supervisor.  John/Jane DOE is believed to be located in Lincoln, Nebraska at the central office of the Nebraska State Patrol.

6.

ARNOLD is assigned to Troop D of the Nebraska State Patrol, headquartered in Scottsbluff. He is a lieutenant and a supervisor.

7.

COCKLE and WILKIE are assigned to Troop B of the Nebraska State Patrol, headquartered in Columbus.  Both are dog handlers.  Although this matter was not a SWAT callout, WILKIE is a SWAT member with SWAT training.

8.

This action is brought pursuant to the provisions of 28 U.S.C. §§ 1331 and 1333, and 42 U.S.C. §§ 1983 and 1988.  The proper venue for this action is the United States District Court for the District of Nebraska, because the action complained of occurred in rural Custer County, Nebraska.

FACTUAL BACKGROUND

9.

These events began to unfold on at 2336 hours on February 22, 2020, when STUMP, acting in his capacity as a deputy of the Custer County Sheriff's Office, pulled over a vehicle driven by Print Zutavern on suspicion that PRINT was driving while intoxicated.  PRINT's wife, Kate Zutavern, was a passenger in the vehicle.  This was near Merna, Nebraska.

10.

STUMP recognized PRINT from previous encounters and knew PRINT to have a history of serious mental illness.

11.

On multiple occasions before 2336 hours on February 22, 2020, PRINT had been taken into

emergency protective custody by law enforcement because he was unable to care for himself and/or because he was a danger to himself or others.  When he had been taken into emergency protective custody in the past, law enforcement had transported him for emergent medical evaluation and inpatient psychiatric treatment.

12.

On this occasion, STUMP recognized PRINT to be behaving erratically.  PRINT pulled out a pocketknife and said "I could stab you with this."  When STUMP found a Chapstick in PRINT's pocket, PRINT said "I could stab you with this" as well.  PRINT perseverated on the numbers on STUMP's license plate and would not explain why he was fixated on the numbers.  He called STUMP "big chicken" and said "I can hear you clucking," and began singing "Old MacDonald had a farm."

13.

Meanwhile, Custer County Sheriff's Deputy GIBBONS arrived on-scene to assist STUMP. GIBBONS was also familiar with PRINT, and knew PRINT to have a history of serious mental illness that had required emergency protective custody in the past.  GIBBONS talked to Kate Zutavern, who told GIBBONS that she feared PRINT was sliding into a manic episode as a result of poor rest during calving.

14.

GIBBONS observed PRINT behaving argumentatively with STUMP in field sobriety tests. The deputies ultimately concluded that PRINT had passed the field sobriety tests, but decided to drive PRINT (and his wife) to his home in Broken Bow nonetheless instead of taking PRINT into emergency protective custody.  During that approximately 15-minute drive, STUMP could hear PRINT weeping in the back seat, as he was upset again about the numbers on STUMP's license

plate.

15.

After midnight on February 23, 2020, Kate Zutavern called 911 to report that PRINT had exploded in rage, punching a mirror, tearing a door off the hinges, punching holes in the wall and screaming in Kate's face in fury. When GIBBONS picked Kate up, she was walking along County Road 796 after midnight, without a coat or shoes, terrified.  GIBBONS transported Kate to the sheriff's office, and Kate called PRINT's father, John Zutavern, to summon him into town from the Rolling 7 Ranch, which is located between Dunning and Arnold, Nebraska.

16.

STUMP returned to PRINT and Kate's home about an hour later with a family friend, and sent the family friend into the house to check on PRINT.  The family friend is untrained in mental health assessment or crisis intervention.  The family friend reported that he would stay the night with PRINT and then, the next morning, would take PRINT to Richard Young Hospital in Kearney, an inpatient psychiatric facility.  On that plan, the Custer County Sheriff's Office decided to take no further action.

17.

At about 0330 on February 23, 2020, the family friend called the Custer County Sheriff's Office again to say that PRINT wanted to go to Richard Young Hospital in Kearney right now. (Impulsivity is a hallmark symptom of a manic episode of bipolar disorder I, which was PRINT's diagnosis.)  The family friend needed a sheriff's deputy to transport him to PRINT's pickup, which was back where STUMP had originally pulled PRINT and his wife over near Merna.

18.

GIBBONS drove the family friend to retrieve PRINT's pickup, leaving PRINT alone in the

house and without an escort outside of PRINT's house to make sure PRINT did not leave.  Then the family friend called again to say that when he returned to PRINT's home, PRINT was gone.  PRINT had stolen a neighbor's truck (with an empty stock trailer attached) and driven himself to Richard Young Hospital in Kearney.

19.

This is what happened as a result of GIBBONS and STUMP, and poor training by Sheriff OSMOND, leaving alone in his home a man whom they knew to have a history of serious mental illness and volatile behavior, whom they had just personally observed behaving consistently with that history, and whose wife had just reported to them that he had had a violent explosion of rage that caused her to flee their home in the freezing darkness of night.

20.

PRINT drove to Kearney in the stolen pickup (with the empty stock trailer hitched to it). After eight previous inpatient hospitalizations and long-term rehabilitation and education at a facility for dual-diagnosis patients with bipolar disorder I, PRINT had learned to recognize the symptoms of the onset of a manic episode, and he sought admission for inpatient treatment.  But after PRINT arrived at Richard Young Hospital, a negligent nurse did not report all of PRINT's symptoms or history to the physician tasked with screening admissions, and the physician approved her recommended that admission be denied.  The nurse directed PRINT to go home and look into anger management.   PRINT left Richard Young Hospital and returned to Custer County, to his grandmother's house.

21.

The aforementioned family friend learned that Richard Young Hospital had declined to admit PRINT, and reported the same to the Custer County Sheriff's Office.  GIBBONS confirmed this with

a call to Richard Young Hospital. PRINT then presented at the Custer County Sheriff's Office in the stolen pickup (and empty stock trailer), looking for his cell phone and his wife. Still, STUMP, GIBBONS, OSMOND and the Sheriff's Office did not take PRINT into emergency protective custody. PRINT left.

22.

GIBBONS made contact again with the family friend, who said he was with PRINT at PRINT's home but he "thought he could handle it."

23.

At 0330 on February 24, 2020, PRINT's father, John Zutavern, called 911 from the Rolling 7 Ranch, requesting assistance with PRINT, who was at the clubhouse on the ranch with his parents. John reported that PRINT was in bad shape and that his manic episode had worsened, that he had shot two bucket calves and was making suicidal statements. John reported that there were firearms in the clubhouse and that PRINT had texted Kate a photograph of a shotgun to his head. John told GIBBONS that there was no reasoning with PRINT in that moment, and that he and his wife had left the ranch after pulling keys from all of the vehicles except for a RAZR, which they had just realized they had mistakenly left the keys in.

24.

GIBBONS contacted OSMOND, who in turn summoned the Nebraska State Patrol ("NSP") and briefed NSP on the situation, including the fact that there were two main entrances/exits for the Rolling 7 Ranch.

25.

PRINT's parents had left the clubhouse freely. There were no hostages in the clubhouse with PRINT at any time after PRINT's parents left the clubhouse, a fact that was always known to all

Defendants.  PRINT also never held a law enforcement officer or any bystander hostage at any time during this event.

26.

PRINT never fired, aimed or brandished a firearm at a law enforcement officer at any time during this event.  After law enforcement became involved, there are no allegations that PRINT fired, aimed or brandished a firearm at anyone or any animal.

27.

After OSMOND summoned NSP, SCHMIDT had on-scene command authority for the NSP response.  He communicated with an Illinois State Police lieutenant who had information about PRINT's personal history of competitive firearm marksmanship.  Concerned that PRINT could exit the ranch off-road using the RAZR, SCHMIDT summoned air support.  SCHMIDT also summoned bomb technicians who could bring robots that could access the clubhouse and/or PRINT.

28.

SCHMIDT assigned MORTENSON to communicate with PRINT in the role of a negotiator.  For many hours on February 24, MORTENSON had limited phone contact and then texted with PRINT and received PRINT's unhinged messages.  PRINT made statements warning law enforcement to stay away from the clubhouse, but also made statements that were simply nonsensical, and sent MORTENSON photographs of checks with bizarre amounts of money and bizarre remarks written on them.  He spoke of hearing shots, when no shots were being fired anywhere.  MORTENSON identified that PRINT was in the throes of a serious mental illness.

29.

SCHMIDT directed the course of this standoff for several hours.  He considered coordinating with the local power company to terminate electricity supply to the clubhouse; but that was never

done. Dog handlers were also brought to the scene so that if PRINT left the clubhouse, a trained police service dog could be deployed to coerce PRINT into custody.

30.

ARNOLD arrived at the ranch at around 1400 hours. He reported to SCHMIDT and was briefed on the situation. He then took a ride in the NSP helicopter for approximately 45 minutes of aerial surveillance to see what the Rolling 7 Ranch looked like.

31.

SCHMIDT did not want the standoff to persist beyond 12 hours. Eventually, under SCHMIDT's direction, although this response was not a SWAT callout, SCHMIDT sent a light-armored vehicle (LAV) to the clubhouse to deploy a robot to disable the RAZR by puncturing its tires.

32.

The LAV is a large, ominous military-style vehicle. It has a power antennae by which personnel inside the vehicle can operate a robot. Other NSP personnel, including ARNOLD and TREVINO, followed the LAV in non-armored vehicles. As the LAV approached the clubhouse, PRINT emerged from the clubhouse, wearing a helmet and goggles.

33.

PRINT climbed onto the RAZR, turned the keys in the ignition and pulled away. PRINT came nose-to-nose with the robot, then turned around the robot and headed east toward the main entrance of Rolling 7 Ranch on the Arnold-Dunning Road. After MORTENSON had told PRINT for several hours to turn himself in to get mental health help, it appeared that PRINT was finally following that directive.

34.

ARNOLD and TREVINO followed PRINT in a non-armored vehicle, as did WORKMAN in a separate non-armored vehicle. Then ARNOLD directed TREVINO to ram PRINT on the RAZR. TREVINO followed that directive. PRINT stayed on the RAZR and did not respond to the provocation or make any sort of head movements. Although there was an old firearm on the RAZR (one that was always on that RAZR, used to shoot coyotes or other vermin on the ranch), PRINT did not reach for the firearm.

35.

OSMOND had advised SCHMIDT that he had arranged to have a mental health bed ready and available for PRINT if PRINT would submit to emergency protective custody. SCHMIDT knew that he or OSMOND would use a toll-free number available for law enforcement for persons who need mental health attention, and the plan was that they would ask PRINT to walk out, and would have a vehicle waiting for him and would transport him immediately to an inpatient mental health facility. OSMOND had made these arrangements and communicated this to SCHMIDT. Unfortunately, SCHMIDT did not communicate OSMOND's plan to ARNOLD, TREVINO and the personnel waiting at the entrance to the Rolling 7 Ranch on the Arnold-Dunning Road.

36.

The personnel at the entrance to the Rolling 7 Ranch on the Arnold-Dunning Road included COCKLE and WILKIE, who had literally just arrived at the entrance about 10 minutes before PRINT left the clubhouse on the RAZR. COCKLE and WILKIE had driven to this event from Lincoln and Grand Island to assist as dog handlers, knowing that the goal was to get a suicidal subject into a mental health facility, and they had remained in radio contact during this multiple-hour drive. SCHMIDT could have and should have prepared COCKLE and WILKIE for the dynamics of the scene and the plan for taking PRINT into emergency protective custody during that

drive-time.

37.

Instead, when PRINT approached the entrance to the Rolling 7 Ranch and ARNOLD and TREVINO rammed PRINT on the RAZR, things devolved into chaos – not because of PRINT, whom law enforcement knew to be mentally ill and whom law enforcement could predict would be unable to process and follow commands; but because of a failure of leadership, planning, training and execution by the law enforcement personnel who were charged with managing a hostageless scene and a mentally ill man who did not present a weapon and who was following orders to turn himself in.

38.

SCHMIDT had not designated and prepared an arrest team.  MORTENSON had not directed PRINT specifically where to go to turn himself in to receive mental health help, although it should have been intuitive that PRINT would go to the main entrance of the Rolling 7 Ranch and Defendants should have expected that that was where PRINT would go.  SCHMIDT had disregarded an offer of help from an Illinois State Police sergeant and SWAT leader who had a personal relationship with PRINT and personal knowledge of the Rolling 7 Ranch.  All Defendants, especially those with SWAT training, had been trained of the significance of a subject who is seriously mentally ill, exhausted, and is likely unable to process and correctly follow commands, especially if those commands are in any manner unclear.  SCHMIDT was responsible for imparting upon Defendants, on top of that training, the knowledge that PRINT in particular was seriously mentally ill, exhausted and likely unable to process and correctly follow commands.

39.

Further, there had been no urgency to create the provocation inherent in sending a military-

style LAV to the clubhouse.  Defendants all knew that PRINT had no hostages, and Defendants had other less-provocative options (such as terminating power to the clubhouse) to coax PRINT from the clubhouse that they had not yet attempted.  Defendants prioritized completing this operation by a certain time over completing this operation in a manner that preserved the life and safety of PRINT, who was the only person whose safety John Zutavern had asked law enforcement to protect when he called 911.

40.

After TREVINO rammed PRINT on the RAZR, PRINT waited a moment.  TREVINO and ARNOLD exited their vehicle and pointed their firearms at PRINT from the cover of their vehicle; at the same time, COCKLE and WILKIE were, just a few feet away, pointing their firearms at PRINT from the opposite direction, thus creating a crossfire situation.  In contravention of their training, all of those Defendants were screaming commands at PRINT simultaneously, creating predictable confusion and increasing the tension and chaotic feeling of the scene for this manic, exhausted, mentally ill man.

41.

The sun had not yet set, and an observant and alert law enforcement officer could see that when PRINT exited the RAZR, he was unarmed.

42.

No Defendant deployed his dog, although COCKLE, WILKIE and WORKMAN were dog handlers and had brought their dogs to the scene.

43.

No Defendant deployed any less-lethal alternatives, or was prepared to deploy any less-lethal alternatives.

44.

PRINT walked toward COCKLE and WILKIE's vehicle, with COCKLE, WILKIE, ARNOLD and TREVINO continuing to scream commands at PRINT, rather than just one officer issuing directives.

45.

COCKLE had, in his mind, thought he would go hands-on and arrest PRINT, but he could not do so because he was holding a rifle.  Thus he just continued to point his rifle at PRINT and scream commands at PRINT.

46.

Neither WILKIE nor COCKLE popped the vehicle door to deploy a police service dog.

47.

WILKIE shot PRINT three times, then handcuffed him.  Soon thereafter, PRINT died of his wounds.

48.

PRINT's wife, Kate, and his parents, John and Charla, called law enforcement because they wanted law enforcement to help him.  Instead, law enforcement shot him, and he died of those wounds.

### FIRST CAUSE OF ACTION

### 42 U.S.C. § 1983 - STUMP AND GIBBONS AND COUNTY OF CUSTER

49.

PRINT had a right under the Constitution of the United States to be free from state-created danger, and to substantive due process.

50.

At all times relevant to this Complaint, Defendants STUMP and GIBBONS were acting under color of law – under the constitutions, statutes, administrative rules, customs, policies and usages of the Custer County Sheriff's Office, the State of Nebraska and the United States – and had assumed the responsibilities, activities, and rights involved in exercising their roles as members of the professional law enforcement staff of the Custer County Sheriff's Office.

51.

Defendants, in their communications described above with PRINT, Kate Zutavern and John Zutavern, committed an affirmative act which both created and increased the risk that PRINT would be exposed to an act of violence.

52.

Defendants thus created a special danger to PRINT wherein governmental actions placed PRINT specifically at risk.

53.

STUMP, GIBBONS and Custer County Sheriff's Office knew or should have known that their actions specifically endangered PRINT.

54.

Defendants acted with deliberate indifference to PRINT's known and recognized constitutional and legal rights to due process and bodily integrity and to be free from state-created and indifference to his rights.  Defendants actively participated in the deprivation of PRINT's constitutional rights.

55.

The conduct of STUMP, GIBBONS and Custer County Sheriff's Office, within their duties

as state actors and under color of state law, deprived PRINT of rights, privileges and immunities secured by the United States Constitution.  Particularly, PRINT was deprived of his constitutional liberty interest in life, due process and bodily integrity and in freedom from excessive punishment and indifference to his rights.

## SECOND CAUSE OF ACTION

## 42 U.S.C. § 1983 – COUNTY OF CUSTER and OSMOND

### 56.

OSMOND and COUNTY OF CUSTER are charged with the responsibility and duty to protect and serve the public by properly hiring, training and controlling deputies under their command, including STUMP and GIBBONS.  This duty includes promulgation and enforcement of rules, regulation and training regarding mentally ill subjects.

### 57.

This duty includes a duty to train deputies that when a subject exhibits signs of a serious mental illness, and when a close family member reports live concerns that the subject is in the throes of an escalating mental illness, it is reckless to simply throw up one's hands and say "well, the hospital won't take him anyway" instead of taking that subject into custody and transporting him for evaluation and treatment.  So, too, it is reckless to split hairs over "he smashed a mirror, punched holes in the wall and tore doors off the hinges and got in his wife's face screaming in rage at her *but* he didn't actually strike his wife, so therefore he isn't dangerous to his wife" in evaluating whether to take a subject into emergency protective custody.

### 58.

OSMOND's duty also includes a duty to train deputies to not leave a subject who is known to be mentally ill and dangerous, and who is willing to be transported for emergent mental health

evaluation, alone in his home; and to not allow that subject to later enter and exit the sheriff's office in a pickup known to be stolen.

59.

Custer County Sheriff's Office and OSMOND, as the final policymaker, failed to promulgate adequate training, rules and regulations relating to subjects who were suspected to be acutely mentally ill, and further failed to instruct and train professional law enforcement staff in how to conduct encounters with individuals who were suspected to be seriously mentally ill.

60.

Custer County Sheriff's Office and OSMOND, as the final policymaker, established through tacit authorization or explicit instruction a policy or custom of casually letting some mentally ill subjects just go home and "sleep it off" or whatever will result in the least effort for law enforcement. That policy was enacted and enforced with deliberate indifference in the constitutional rights of persons effected thereby.

61.

Custer County Sheriff's Office and OSMOND's, as final policymaker's custom of failing to properly train and control professional law enforcement staff, including STUMP and GIBBONS, and their failure to ensure compliance with training and regulations, amounts to deliberate indifference to the rights of persons with whom STUMP and GIBBONS come into contact, including the rights of PRINT.

62.

Custer County Sheriff's Office and OSMOND, as final policymaker's, custom and policy of allowing deputies to casually let persons known to be mentally ill just go "sleep it off" was so reckless that an escalation to lethal force was inevitable as of the date of the incident giving rise to this

Complaint.

## THIRD CAUSE OF ACTION

### 42 U.S.C. § 1983 - NSP DEFENDANTS

63.

PRINT had a right under the Constitution of the United States to be free from excessive punishment and indifference to his psychiatric needs, as well as a right to due process and equal protection, by employees of governmental entities.

64.

At all times relevant to this Complaint, the Nebraska State Patrol Defendants, and each of them, were acting under color of law – under the constitutions, statutes, administrative rules, customs, policies and usages of the Nebraska State Patrol, the State of Nebraska and the United States – and had assumed the responsibilities, activities, and rights involved in exercising their roles as members of NSP's professional staff.

65.

After NSP took over management of the response to John Zutavern's 911 call, Defendants, and each of them, acted with deliberate indifference to PRINT's known and recognized constitutional and legal rights to due process, equal protection and bodily integrity and to be free from excessive punishment and indifference to his psychiatric medical needs.  Defendants actively participated in the deprivation of PRINT's constitutional rights by causing PRINT to be subject to fatal gunshot wounds.

## FOURTH CAUSE OF ACTION

### *42 U.S.C. § 1983 - Policy or Custom of Poor Management of Barricaded/Mentally Ill Subject Standoffs*

66.

SCHMIDT had a special relationship with PRINT, by virtue of the fact that SCHMIDT had custody and control over PRINT. Due to his severe mental illness and NSP's blockage of the exits to the Rolling 7 Ranch, PRINT could not care for his own medical needs during the standoff. SCHMIDT knew this, and further knew that he had a duty to exercise reasonable care in the selection, assignment and supervision of the law enforcement professional staff who were to be involved with bringing this standoff to a peaceful resolution after PRINT's family had asked for help.

67.

By those failures set forth above, SCHMIDT acted with deliberate indifference to a known risk of constitutional deprivation to PRINT.

68.

As a result of SCHMIDT's deliberate indifference to the risk of deprivation of PRINT's constitutional liberty interests, PRINT's Estate incurred damages as set forth below.

69.

PRINT could not have reasonably discovered that NSP had a custom or practice of tolerating poor management of barricaded subject standoffs, and of failing to provide adequate training and staffing to implement reasonable mental health care and suicide prevention practices, because such knowledge was specifically held by officers and agents of NSP, including SCHMIDT. Moreover, PRINT was – as previously noted – severely mentally ill, and could not be reasonably expected to discover NSP's harmful customs and practices, and to protect himself, because PRINT was in the grips of a manic episode of bipolar disorder I.

## FIFTH CAUSE OF ACTION

## 42 U.S.C. § 1983 – FAILURE TO TRAIN BY DOE

70.

At all times relevant to this Complaint, DOE had a custom or practice at NSP of failing to train its employees to be observant of and act upon signs and indications of serious mental illness and suicidality in barricaded subjects.  DOE failed to implement training materials and programs related to recognizing and understanding patterns of mental illness and suicide.

71.

By failing to train personnel to recognize and respond appropriately to warning signs and dangers of mental illness and suicidality in subjects, DOE acted with deliberate indifference to a known risk of constitutional deprivation to PRINT.

72.

As a result of DOE's deliberate indifference to the risk of deprivation of PRINT's constitutional liberty interests set forth above, PRINT's Estate has incurred damages as set forth below.

**PUNITIVE DAMAGES**

73.

In addition to compensatory damages, Plaintiff hereby makes a claim for punitive damages against Defendants in an amount to be proven at trial for the willful and wanton acts and omissions of Defendants, to include violation of PRINT's civil rights, as alleged herein.  The acts and omissions of Defendants in this case were so gross and culpable in nature that they constitute reckless indifference and callous and wanton disregard for the law and for the lives and safety of others, including PRINT.  Defendants committed the acts and omissions alleged herein and callously set in motion a chain of events that any reasonable person could see would lead to utter disaster. Defendants' actions should be punished, and an example should be made so that these actions and

omissions are not repeated.

74.

The recovery of punitive damages is permitted under the federal civil rights statutes for reckless and callous indifference to the federally protected rights of others, and is thus appropriate in this case. This instance of reckless and callous indifference to PRINT's life and safety and constitutional rights should be punished through the imposition of punitive damages so as to make an example of conduct that will not be tolerated.

## ATTORNEY'S FEES

75.

As a result of Defendants' actions as alleged herein, Plaintiff was required to retain the services of attorneys and are entitled to a reasonable amount for attorney's fee pursuant to 42 U.S.C. § 1988 for those violations covered by the Civil Rights Act.

## DAMAGES

76.

The acts and omissions of Defendants as set forth above have resulted in damages to PRINT's Estate, in these particulars:

1.   Compensatory damages in an amount to be proven at trial for the violation of PRINT's rights under the federal and state Constitutions;

2.   Punitive damages to punish and deter the reprehensible conduct alleged, and captured on audio recordings, in this Complaint;

3.   Attorneys' fees and expenses available under 42 U.S.C. § 1988; and

4.   The costs of this action and such other and further relief as this Court deems equitable and proper.

**WHEREFORE,** Plaintiff prays for judgment against the defendants as follows:

A.      Plaintiff prays for damages in an amount which will fairly and justly compensate for the loss of PRINT's life and the violation of his civil rights, and other consequential damages flowing from the violations and torts set forth herein;

B.      Punitive damages in an amount sufficient to adequately punish defendants and to deter future conduct of the type alleged in this Complaint;

C.      For attorneys' fees pursuant to 42 U.S.C. § 1988; and

D.      For the costs of this action and for such other and further relief as this Court deems equitable and proper.

## JURY DEMAND AND DESIGNATION OF PLACE OF TRIAL

Plaintiff requests that this matter be tried to a jury in Lincoln, Nebraska.

BRYAN S. MICK, Personal Representative of the Estate of PRINT ZUTAVERN, Deceased, Plaintiff,

By:   /s/ *Maren Lynn Chaloupka*
Maren Lynn Chaloupka – NSBA # 20864
Chaloupka Law LLC
1906 Broadway
P.O. Box 1724
Scottsbluff, Nebraska  69363-1724
(308) 270-5091
mlc@chaloupkalaw.net