IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| BRYAN S. MICK, Personal Representative of the Estate of Print Zutavern, Deceased; | 4:22-CV-3025 |
| Plaintiff, | |
| vs. | MEMORANDUM AND ORDER NUNC PRO TUNC |
| DEPUTY BARRETT GIBBONS, et al.; | |
| Defendants. | |

Print Zutavern was shot and killed by Trooper Brandon Wilkie of the Nebraska State Patrol (NSP) during a law enforcement operation aimed at getting Mr. Zutavern to a mental health facility. Bryan Mick, the personal representative of the Estate of Mr. Zutavern, has sued multiple parties that were allegedly involved in the incident, including Trooper Wilkie and several other members of the NSP (filing 1). This matter is before the Court on the NSP defendants' motion to dismiss most of the claims against them (filing 46). For the reasons outlined below, the Court will grant this motion.

## I. BACKGROUND

According to the plaintiff, the claims in this case arose as follows. On February 22, 2020, Deputy Lawrence Stump of the Custer County Sheriff's Office stopped Mr. Zutavern on suspicion of driving while intoxicated. Filing 1 at 3. His wife, Kate Zutavern, was a passenger in the vehicle at the time. Filing 1 at 3. Deputy Stump was allegedly familiar with Mr. Zutavern, as he had "been taken into emergency protective custody by law enforcement" on multiple occasions prior to the stop when "he was unable to care for himself

and/or because he was a danger to himself or others." Filing 1 at 3-4. In these scenarios, law enforcement had allegedly transported him to inpatient psychiatric treatment centers. Filing 1 at 4. In total, Mr. Zutavern had allegedly been hospitalized eight times at a facility for dual-diagnosis patients with bipolar disorder I. Filing 1 at 6.

During the stop, Mr. Zutavern exhibited erratic behavior. At one point, he presented a pocketknife and told Deputy Stump, "I could stab you with this." Filing 1 at 4. Later, he made the same threats with a Chapstick. Filing 1 at 4. Mr. Zutavern also called Deputy Stump a "big chicken" and sang "Old MacDonald had a farm." Filing 1 at 4. When Deputy Barrett Gibbons arrived on the scene to provide assistance, Mr. Zutavern was undergoing field sobriety tests. Filing 1 at 4. However, after Mrs. Zutavern expressed concern that her husband was having a manic episode, the deputies concluded that Mr. Zutavern was not under the influence, and Deputy Stump drove the Zutaverns home in his cruiser. Filing 1 at 4-5.

Shortly after the couple returned home, Mrs. Zutavern called 911 to report that her husband "had exploded in rage," defacing their property and screaming in her face. Filing 1 at 5. While en route to respond to the call, Deputy Gibbons located Mrs. Zutavern walking along the side of the road. Filing 1 at 5. She was transported to the sheriff's office, where she called Mr. Zutavern's father, John Zutavern, and requested that he come from his ranch, the Rolling 7 Ranch, to help. Filing 1 at 5. Meanwhile, Deputy Stump returned to the Zutaverns home with a family friend who agreed to stay the night with Mr. Zutavern and take him to an inpatient psychiatric facility the next day. Filing 1 at 5.

However, in the early morning hours of February 23, 2020, this family friend called the sheriff's office to report that Mr. Zutavern wanted to go to the

psychiatric facility immediately. Filing 1 at 5. Upon request, Deputy Gibbons retrieved the family friend and drove him to Mr. Zutavern's pickup, which was still parked where Deputy Stump had originally conducted the traffic stop. Filing 1 at 5. During this time, Mr. Zutavern was left at home unattended, and by the time the men returned with his pickup, he had stolen his neighbor's truck and driven himself to the Richard Young Hospital in Kearney, Nebraska. Filing 1 at 5-6. But Mr. Zutavern was allegedly denied admission and told to go home. Filing 1 at 6.

Shortly after, Mr. Zutavern drove to the sheriff's office in the stolen truck to look for his wife and his cell phone. Filing 1 at 7. But Mr. Zutavern was not taken into custody at this time; instead, he went home to meet up with the same family friend, who had allegedly told Deputy Gibbons that he "thought he could handle [Mr. Zutavern]." Filing 1 at 7. However, the next day, John Zutavern called 911 from the Rolling 7 Ranch requesting assistance for his son. Filing 1 at 7. He allegedly reported that Mr. Zutavern was in bad shape and that his manic episode had worsened. Filing 1 at 7. Specifically, he reported that Mr. Zutavern had shot two calves, was making suicidal statements, and was in the property's clubhouse sending photos of himself with a shotgun to his head. Filing 1 at 7.

John also spoke to Deputy Gibbons, reporting that he and his wife had left the ranch because "there was no reasoning" with their son but had accidentally left the keys in a RAZR utility task vehicle that was on the property. Filing 1 at 7. However, despite Mr. Zutavern's erratic behavior, they allegedly left the clubhouse and the ranch freely. Filing 1 at 7-8. After this conversation, Deputy Gibbons notified Dan Osmond, the Custer County Sheriff, of the situation, and Sheriff Osmond in turn summoned the NSP. Filing 1 at 7. Captain Tyler Schmidt, who allegedly had on-scene command

3

authority for the NSP response, was briefed on the situation, including the fact that Mr. Zutavern had a "personal history of competitive firearm marksmanship." Filing 1 at 8. Ultimately, Sheriff Osmond and Captain Schmidt devised a plan: they would convince Mr. Zutavern to exit the clubhouse and urge him to go to a mental health hospital. Filing 1 at 10. Captain Schmidt then summoned NSP personnel, air support, bomb technicians, dog handlers, and negotiator Trooper Sam Mortenson, but allegedly failed to communicate the particulars of this plan with any personnel on the response team. Filing 1 at 8-9.

According to the plaintiff, a standoff ensued for several hours. Filing 1 at 8. During this time, Trooper Mortenson allegedly communicated with Mr. Zutavern over the phone and in text messages, in which Mr. Zutavern warned law enforcement to stay away from the clubhouse and sent unhinged messages. Filing 1 at 8. Mr. Zutavern also allegedly told Trooper Mortenson that he was hearing gunshots even though no guns were being fired. Filing 1 at 8. In response to these communications, Trooper Mortenson allegedly told Mr. Zutavern multiple times to turn himself in to get mental health help. Filing 1 at 9.

When the standoff was approaching its twelfth hour, Captain Schmidt allegedly directed NSP personnel to approach the clubhouse in a light-armored vehicle (LAV) and "deploy a robot to disable the RAZR." Filing 1 at 9. According to the plaintiff, Captain Schmidt used this more abrasive approach—as opposed to less direct approaches to coax Mr. Zutavern out of the clubhouse— because he was fixated on completing the operation before it went over twelve hours. Filing 1 at 9, 12. The LAV was followed by Lieutenant Tim Arnold and Trooper Carlos Trevino, who were in a non-armored vehicle. Filing 1 at 9. But as the vehicles approached, Mr. Zutavern exited the clubhouse wearing a

4

helmet and goggles, entered the RAZR, and drove toward the ranch's main entrance. Filing 1 at 9. He was followed by Lieutenant Arnold and Trooper Trevino, as well as Sergeant Matt Workman, a dog handler who was also driving a non-armored vehicle. Filing 1 at 10.

Troopers Levi Cockle and Brandon Wilkie—dog handlers who had arrived on the scene approximately ten minutes before Mr. Zutavern left the clubhouse—were stationed at the entrance. Filing 1 at 10. Although the particulars of Sheriff Osmond and Captain Schmidt's plan were allegedly not communicated to them, the plaintiff's complaint acknowledges that both Troopers Cockle and Wilkie knew that the goal of the operation "was to get a suicidal subject into a mental health facility." Filing 1 at 10. As Mr. Zutavern approached the entrance, Lieutenant Arnold instructed Trooper Trevino to "ram" the RAZR with their trailing vehicle. Filing 1 at 10. And the plaintiff asserts that although Trooper Trevino followed that directive, Mr. Zutavern did not respond to the provocation nor did he reach for the firearm that was "always" on the RAZR "to shoot coyotes or other vermin." Filing 1 at 10.

But shortly after the RAZR was rammed, Mr. Zutavern allegedly "waited a moment." Filing 1 at 12. In response, Trooper Trevino and Lieutenant Arnold "exited their vehicle and pointed their firearms at [Mr. Zutavern] from the cover of their vehicle" while Troopers Cockle and Wilkie, who were just a few feet away, were also pointing their firearms at Mr. Zutavern from the opposite direction. Filing 1 at 12. According to the plaintiff, Mr. Zutavern never "fired, aimed or brandished a firearm at anyone or any animal" while law enforcement was present. Filing 1 at 8. Still, as Mr. Zutavern exited the RAZR and started walking toward Troopers Cockle and Wilkie, all four officers allegedly kept their firearms drawn and screamed commands at him. Filing 1 at 12-13. And although Mr. Zutavern was allegedly "unable to process and follow" these

directives because of his mental state, Trooper Wilkie shot him three times as he approached. Filing 1 at 11-13. Mr. Zutavern died from these injuries. Filing 1 at 13.

The plaintiff asserts that any observant and alert law enforcement officer could have seen that Mr. Zutavern was unarmed when he exited the RAZR. Filing 1 at 12. Yet, no defendant deployed any less-lethal alternatives, or was prepared to do so. Filing 1 at 12. And no defendant deployed his dog, though Trooper Cockle, Trooper Wilkie, and Sergeant Workman all had their dogs on the scene. Filing 1 at 12. Accordingly, Mr. Mick has sued the individual law enforcement officers listed above and Custer County under 42 U.S.C. § 1983, arguing that the overall "failure of leadership, planning, training and execution by the law enforcement personnel" led to the unconstitutional death of a mentally ill man. Filing 1 at 11. And this matter is now before the Court on the NSP defendants' motion to dismiss the claims[1] against Trooper Mortenson, Sergeant Workman, Lieutenant Arnold, Trooper Trevino, Trooper Cockle, and Captain Schmidt.[2] Filing 46. The Court will address the claims against each defendant in turn.

---

[1] Although all of the NSP defendants were sued in both their official and individual capacities, *see generally* filing 1, the plaintiff has "confesse[d] without prejudice the Motion of Nebraska State Patrol Defendants to Dismiss the claims against them in their official capacities." Filing 49. Thus, the official-capacity claims against the NSP defendants are dismissed pursuant to this confession, and the Court will address the individual-capacity claims against the NSP defendants in this Order.

[2] The defendants do not argue that the claims against Trooper Wilkie in his individual capacity should be dismissed. Filing 47 at 6.

6

## II. STANDARD

A complaint must set forth a short and plain statement of the claim showing that the pleader is entitled to relief. Fed. R. Civ. P. 8(a)(2). This standard does not require detailed factual allegations, but it demands more than an unadorned accusation. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The complaint need not contain detailed factual allegations, but must provide more than labels and conclusions; and a formulaic recitation of the elements of a cause of action will not suffice. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). For the purposes of a motion to dismiss a court must take all of the factual allegations in the complaint as true, but is not bound to accept as true a legal conclusion couched as a factual allegation. *Id.*

And to survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6), a complaint must also contain sufficient factual matter, accepted as true, to state a claim for relief that is plausible on its face. *Iqbal,* 556 U.S. at 678. A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Id.* Where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but has not shown—that the pleader is entitled to relief. *Id.* at 679.

Determining whether a complaint states a plausible claim for relief will require the reviewing court to draw on its judicial experience and common sense. *Id.* The facts alleged must raise a reasonable expectation that discovery will reveal evidence to substantiate the necessary elements of the plaintiff's claim. *See Twombly*, 550 U.S. at 545. The court must assume the truth of the plaintiff's factual allegations, and a well-pleaded complaint may proceed, even if it strikes a savvy judge that actual proof of those facts is improbable, and that recovery is very remote and unlikely. *Id.* at 556.

7

III. DISCUSSION

The NSP defendants argue that the plaintiff has failed to state a claim against them, as he has failed to plead facts showing how each defendant's individual actions violated Mr. Zutavern's constitutional rights. *See* Filing 47 at 6; filing 60 at 3. In order to state a § 1983 claim, "a plaintiff must allege that an official acting under the color of state law violated rights guaranteed either by the Constitution or by federal statute." *Kelly v. City of Omaha*, 813 F.3d 1070, 1075 (8th Cir. 2016). Here, the Court agrees that the plaintiff's complaint could be interpreted as alleging Fourth, Eighth, and Fourteenth Amendment violations. *See* filing 1 at 17-18; filing 60 at 2, 9-12. Therefore, for the sake of completeness, the Court will address each in determining whether the plaintiff has stated a § 1983 claim against the NSP defendants.

But regardless of which theory the plaintiff uses to establish liability, one critical § 1983 principle must remain at the forefront of the Court's analysis: "To prevail on a § 1983 claim, a plaintiff must show *each individual defendant's personal involvement* in the alleged violation." *White v. Jackson*, 865 F.3d 1064, 1081 (8th Cir. 2017) (emphasis added). This means that officers are only liable for their own conduct, *see Torres v. City of St. Louis*, 39 F.4th 494, 504 (8th Cir. 2022), and one's mere presence at a scene or proximity to unconstitutional conduct is not enough to establish personal involvement in a constitutional violation, *see Faulk v. City of St. Louis, Mo.*, 30 F.4th 739, 746 (8th Cir. 2022). Therefore, the Court must assess each NSP defendant's conduct separately to determine if the plaintiff has sufficiently alleged participation in a Fourth, Eighth, or Fourteenth amendment violation.

1. FOURTH AMENDMENT

First, the plaintiff's complaint alleges that the conduct of the NSP defendants violated Mr. Zutavern's constitutional right to be free from

excessive punishment. Filing 1 at 17. And according to the plaintiff, this claim includes allegations that the individual defendants unreasonably seized Mr. Zutavern with excessive force in violation of his Fourth Amendment rights. Filing 53 at 3-6. Specifically, the plaintiff asserts that the unreasonable seizure of Mr. Zutavern began when the RAZR was rammed and continued until he was fatally shot. Filing 53 at 5-6. Conversely, the NSP defendants argue that Mr. Zutavern was only seized once he was shot, and that the plaintiff has failed to allege facts establishing that any defendant other than Trooper Wilkie was personally involved in effecting that seizure. *See* filing 60 at 9.

(a) Seizure

"A person is seized within the meaning of the Fourth Amendment 'when the officer, by means of physical force or show of authority, terminates or restrains the person's freedom of movement.'" *Torres*, 39 F.4th at 505 (quoting *United States v. Warren*, 984 F.3d 1301, 1303 (8th Cir. 2021)) (cleaned up). In this way, if officers do not apply any physical force to restrain an individual, a seizure only occurs if the individual submits to an assertion of authority. *California v. Hodari D.*, 499 U.S. 621, 626 (1991). Accordingly, "a seizure does not occur during the course of a police pursuit of a fleeing vehicle if the pursuit, as a show of authority, does not produce a stop." *Cole v. Bone*, 993 F.2d 1328, 1332 (8th Cir. 1993). Additionally, since "[a] seizure is a single act, and not a continuous fact," a person is no longer seized if they flee after the seizure was effected. *Hodari D.*, 499 U.S. at 625 (quoting *Thompson v. Whitman*, 18 Wall. 457, 471 (1874)); *see Gardner v. Buerger*, 82 F.3d 248, 254 n.9 (8th Cir. 1996).

When a seizure does occur, the Fourth Amendment is violated if the seizure is "unreasonable." *Gardner*, 82 F.3d at 252. And "[a]ll claims that law enforcement officers have used excessive force, whether deadly or not, in the course of an arrest, investigatory stop, or other seizure are analyzed under the

Fourth Amendment's objective reasonableness standard." *Nance v. Sammis*, 586 F.3d 604, 609-11 (8th Cir. 2009). "The reasonableness of a use of force turns on whether the officer's actions were objectively reasonable in light of the facts and circumstances confronting him, without regard to his subjective intent or motivation." *Torres*, 39 F.4th at 503.

To make this determination, the Court must evaluate "the totality of the circumstances, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade by flight." *Nance*, 586 F.3d at 610 (citations omitted). In this way, the analysis requires "careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Z.J. v. Kan. City Bd. of Police Comm'rs*, 931 F.3d 672, 681 (8th Cir. 2019). The conclusion that officers' actions were reasonable to protect themselves or the general public is not foreclosed just because officers had knowledge of the suspect's mental illness. *See Hassan v. City of Minneapolis, Minn.*, 489 F.3d 914, 919 (8th Cir. 2007); *see also Anderson v. Driskill,* 550 F. Supp. 3d 596, 618 n.203 (E.D. Ark., July 26, 2021). What is relevant in determining reasonableness is the threat the person posed, not what caused his or her threatening behavior. *Frederick v. Motsinger*, 873 F.3d 641, 647 (8th Cir. 2017).

Most importantly, "the calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving." *Gardner*, 82 F.3d at 252. Therefore, courts must be "careful not to indulge in armchair quarterbacking or exploit the benefits of hindsight," even if "[i]t may appear, in the calm aftermath, that an officer could have taken a different

course." *Id*. In this way, the Constitution "requires only that the seizure be objectively reasonable, not that the officer pursue the most prudent course of conduct as judged by 20/20 hindsight vision." *Cole*, 993 F.2d at 1334.

Finally, it is highly relevant to the instant case that "the Fourth Amendment prohibits unreasonable seizures, not unreasonable or ill-advised conduct in general." *Schulz v. Long*, 44 F.3d 643, 648 (8th Cir. 1995). This means that evidence of an officer's unreasonable conduct leading up to a seizure is not sufficient by itself to establish a Fourth Amendment violation, as liability rests on the reasonableness of the seizure itself and "not its elaborate prelude." *Gardner*, 82 F.3d at 254. And in this way, evidence that an officer "created the need to use force by their actions prior to the moment of seizure is irrelevant" to whether he or she participated in a seizure that violated the Fourth Amendment reasonableness requirements. *Schulz*, 44 F.3d 648-49.[3]

The critical question in the instant case is whether the plaintiff has alleged sufficient facts from which the Court could reasonably infer that each NSP defendant was personally involved in an unreasonable seizure. Again, the defendants maintain that the only seizure that occurred was the shooting. *See* filing 60 at 9. And they argue that the "ramming" incident was *not* a seizure since, as the plaintiff pleaded, Mr. Zutavern "stayed on the RAZR and did not respond to the provocation." Filing 10 at 21. But that argument does not acknowledge the entirety of the allegations in the complaint.

---

[3] To say that officers are not liable under the Fourth Amendment for unreasonable conduct preceding a seizure is not to say that evidence of such conduct is never relevant. Where a reasonable jury could conclude that a particular seizure was unreasonable, evidence of the preceding circumstances may be relevant to determining whether the conduct of an individual office who participated in the seizure was reasonable. *Gardner*, 82 F.3d at 254.

11

Although Mr. Zutavern did not have an immediate bodily response to the ramming, after the collision he allegedly "waited a moment," exited the RAZR, and started "walk[ing] toward Cockle and Wilkie." Filing 1 at 10-13. Construing these facts in the light most favorable to the plaintiff, the Court could reasonably infer that Mr. Zutavern submitted to Lieutenant Arnold and Trooper Trevino's show of authority when he stopped and exited the RAZR. In this way, the plaintiff has alleged sufficient facts to establish that Mr. Zutavern was seized when the RAZR was rammed, as there was "a governmentally caused termination of [Mr. Zutavern's] freedom of movement . . . . through means intentionally applied." *Brower v. Cnty. of Inyo*, 489 U.S. 593, 597 (1989).

And there is no question that a seizure also occurred moments later when Mr. Zutavern was shot. *Gardner*, 82 F.3d at 251 ("[I]t is an unavoidable understatement to observe that the shooting was a seizure."). Therefore, what is left to be determined is whether Mr. Zutavern was still seized in the moments after he exited the RAZR but before he was shot. Viewing the facts in the light most favorable to Mr. Zutavern, the Court can reasonably infer that Mr. Zutavern was, in fact, seized in these moments. While a seizure is not a continuous event, the plaintiff does not allege that Mr. Zutavern attempted to flee or evade police after the RAZR was rammed. Instead, he alleges that Mr. Zutavern was walking toward Troopers Cockle and Wilkie to turn himself in, and that he did not present a weapon at this time. Filing 1 at 11.

Meanwhile, Trooper Trevino, Lieutenant Arnold, Trooper Cockle, and Trooper Wilkie were all outside of their vehicles and pointing their firearms at Mr. Zutavern, creating a crossfire situation. Filing 1 at 12. And the positioning of the armed officers along with their use of language demanding compliance both support the conclusion that Mr. Zutavern was seized in these moments.

*See Oglesby v. Lesan*, 929 F.3d 526, 532-33 (8th Cir. 2019). Therefore, the plaintiff has alleged sufficient facts to establish that Mr. Zutavern was also seized when he was surrounded by officers after the ramming.

(b) Individual Participation

Next, the Court must assess whether the facts in the complaint are sufficient to establish each defendant's personal involvement in the seizure before turning to the questions of reasonableness and qualified immunity.

*(i) Trooper Mortenson*

Even viewing the facts in the light most favorable to the plaintiff, it cannot be reasonably inferred that Trooper Mortenson was personally involved in the allegedly unreasonable seizure. There are no facts indicating that Trooper Mortenson even observed Mr. Zutavern being rammed in the RAZR or shot by Trooper Wilkie, let alone that he actively participated in this series of events. In fact, the plaintiff's allegations suggest the opposite. As the negotiator, Trooper Mortenson was communicating with Mr. Zutavern while he was in the clubhouse. Filing 1 at 8; filing 53 at 5. And when Mr. Zutavern left the clubhouse, the plaintiff alleges only that Lieutenant Arnold, Trooper Trevino, and Sergeant Workman pursued him. Filing 1 at 10.

As explained above, Trooper Mortenson's presence at the ranch is simply not enough to establish his personal involvement in the seizure, nor is the fact that he allegedly engaged in unreasonable conduct *prior to the seizure*. Specifically, the plaintiff alleges that Trooper Mortenson communicated with Mr. Zutavern for several hours prior to his seizure. Filing 1 at 8-9. While it may be true that Trooper Mortenson failed to communicate critical information about Mr. Zutavern's mental state to the rest of the officers, such conduct does not establish his involvement in the allegedly unconstitutional seizure. As

13

such, the plaintiff's Fourth Amendment claim against Trooper Mortenson is dismissed.

### (ii) Sergeant Workman

There are also no facts from which the Court could reasonably infer that Sergeant Workman was personally involved in the seizure of Mr. Zutavern. While Sergeant Workman allegedly pursued the RAZR, filing 53 at 8, he was not participating in a seizure at that time, as a seizure does not occur during a pursuit unless it produces a stop. *See Cole*, 993 F.2d at 1332. Here, the pursuit was clearly not producing a stop, which is evidenced by Lieutenant Arnold and Trooper Trevino's decision to ram the RAZR. In this way, the seizure did not occur until the ramming of the RAZR produced a stop. And there are no facts establishing that Sergeant Workman participated in the ramming, either by calling for it or personally carrying it out. Filing 1 at 10-11. Nor are there facts indicating that Sergeant Workman had an active role in the seizure *after* this point. In fact, the complaint only alleges that Trooper Trevino, Lieutenant Arnold, Trooper Cockle, and Trooper Wilkie aimed their firearms and screamed commands at Mr. Zutavern after he exited the RAZR. Filing 1 at 12.

And any of Sergeant Workman's actions, however unreasonable, that occurred prior to the seizure—including his decision to pursue an individual that he knew to be mentally ill—simply do not constitute a Fourth Amendment violation. The same can be said for his decision not to deploy his K9. Filing 1 at 12. That an officer, in hindsight, should or could have taken a different course of action that may have been more reasonable does not create Fourth Amendment liability. What is analyzed is the seizure that *did* occur, and the facts do not establish that Sergeant Workman was personally involved in that seizure. Therefore, the plaintiff's Fourth Amendment claim against Sergeant Workman is dismissed.

14

*(iii) Trooper Cockle*

As for Trooper Cockle, even though the facts establish that he was personally involved in the seizure of Mr. Zutavern, he is entitled to qualified immunity based on the nature of his participation. First, it is important to remember that Trooper Cockle is only liable under § 1983 for his own conduct, and not the conduct of other officers. In this way, the plaintiff must establish that Trooper Cockle's "own actions were directly responsible for a deprivation of [Mr. Zutavern's] rights." *Z.J.*, 931 F.3d at 688. And here, Trooper Cockle's alleged role in the seizure was limited to shouting commands and aiming his firearm at Mr. Zutavern. Filing 1 at 12; filing 53 at 8. Although Trooper Cockle allegedly thought about arresting Mr. Zutavern hands-on, "he could not do so because he was holding a rifle." Filing 1 at 13.

And even if the Court determined that Trooper Cockle's limited conduct was sufficient to support an excessive force claim, a reasonable officer in his position would not have known that this conduct violated Mr. Zutavern's clearly established Fourth Amendment rights. Qualified immunity shields public officials performing discretionary functions from liability for conduct that does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. *Parker v. Chard*, 777 F.3d 977, 979 (8th Cir. 2015); *see Messerschmidt v. Millender*, 565 U.S. 535, 546 (2012); *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly, and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably. *Pearson*, 555 U.S. at 231. It gives government officials breathing room to make reasonable but mistaken judgments about open legal questions

15

and protects all but the plainly incompetent or those who knowingly violate the law. *Parker*, 777 F.3d at 979-80.

In determining whether a government official is entitled to qualified immunity, the Court asks (1) whether the facts alleged establish a violation of a constitutional or statutory right and (2) whether that right was clearly established at the time of the alleged violation, such that a reasonable official would have known that his actions were unlawful. *Johnson v. Phillips*, 664 F.3d 232, 236 (8th Cir. 2011); *see Parker*, 777 F.3d at 980. A district court may address these prongs in any order, but may only deny qualify immunity if both questions are answered in the plaintiff's favor. *Watson v. Boyd*, 2 F.4th 1106, 1112 (8th Cir. 2021).

Whether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action turns on the objective legal reasonableness of the action, assessed in light of the legal rules that were clearly established at the time it was taken. *Messerschmidt*, 565 U.S. at 546; *Pearson*, 555 U.S. at 244. The protection of qualified immunity applies regardless of whether the government official's error is a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact. *Pearson*, 555 U.S. at 231.

For a right to be clearly established, the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. *Parker*, 777 F.3d at 980. Clearly established law is not defined at a high level of generality, since doing so avoids the crucial question whether the official acted reasonably in the particular circumstances that he or she faced. *Id.*; s*ee Seymour v. City of Des Moines*, 519 F.3d 790, 798 (8th Cir. 2008). It is unnecessary to have a case directly on point, but existing

16

precedent must have placed the statutory or constitutional question beyond debate. *Parker*, 777 F.3d at 980.

As for the instant case, it is clearly established that an officer's continuous drawing and pointing of a weapon may constitute excessive force where a suspect is unarmed, does not resist, and does not pose an immediate safety threat. *Wilson v. Lamp*, 901 F.3d 981, 989-90 (8th Cir. 2018). That is because "force is least justified against those who do not flee or actively resist arrest and pose little or no threat to the security of the officers or the public." *Id*. (citing *Brown v. City of Golden Valley*, 574 F.3d 491, 499 (8th Cir. 2009)). Conversely, "when a suspect repeatedly refuses to comply with officers' reasonable commands," the Eighth Circuit has held that officers "may reasonably use some force to secure compliance." *Id*. In such circumstances, "officers are not required to read a suspect's motivations in failing to obey commands." *Neal v. Ficcadenti*, 895 F.3d 576, 581 (8th Cir. 2018). Accordingly, the drawing of a weapon will not constitute excessive force where officers reasonably believe they are confronted with serious danger in light of the threat reasonably perceived. *See Wilson*, 901 F.3d at 989-90.

Even when viewing the facts in the light most favorable to the plaintiff, it cannot be said that Mr. Zutavern was "quietly submit[ting]" in a compliant way that "pose[d] little or no threat." *Wilson*, 901 F.3d at 989-90. Instead, Trooper Cockle was allegedly faced with an individual who, according to the plaintiff's own facts, (1) was known by police to have access to firearms, (2) was driving away from police just moments earlier, and (3) who was actively walking toward him while not following police commands. Filing 1 at 7, 9, 11. Under these circumstances, a reasonable officer would not have known that drawing and pointing a firearm while shouting commands was an objectively

17

unreasonable use of force in violation of Mr. Zutavern's clearly established Fourth Amendment rights.

And although the plaintiff argues that Trooper Cockle had only arrived on the scene shortly before the shooting—which could call into question what facts he knew at the time of the seizure—the plaintiff's complaint alleges that he was briefed on the nature of the operation and "remained in radio contact during [his] multiple-hour drive" to the ranch. Filing 1 at 10. Additionally, although the plaintiff alleges that Mr. Zutavern was likely turning himself in when he was walking toward Troopers Cockle and Wilkie, he does not allege that Mr. Zutavern communicated this intent to anyone, and Trooper Cockle was not required to discern the motivation behind Mr. Zutavern's actions. Therefore, Trooper Cockle is entitled to qualified immunity, and the plaintiff's Fourth Amendment claim against him is dismissed. [4]

### (iv) Lieutenant Arnold and Trooper Trevino

Likewise, Lieutenant Arnold and Trooper Trevino are entitled to qualified immunity in regards to Mr. Zutavern's Fourth Amendment claim. As with Trooper Cockle, reasonable officers in their position would not have known that shouting commands and aiming their firearms at Mr. Zutavern after he exited the RAZR violated his clearly established Fourth Amendment rights. Additionally, even if the "ramming" constituted excessive force, a

---

[4] The plaintiff also argues that Trooper Cockle knew or should have known that shouting commands would confuse Mr. Zutavern, and therefore, his conduct created a situation that necessitated Wilkie's use of force. However, as explained above, that an officer's conduct necessitated the use of excessive force is not a basis for liability, nor does it establish that an officer's conduct *during the seizure* was unreasonable in violation of the Fourth Amendment. See *Schulz*, 44 F.3d at 648-49.

reasonable officer in these circumstances would not have known that this conduct violated Mr. Zutavern's clearly established Fourth Amendment rights.

As stated above, it is clearly established that when officers reasonably perceive that an individual is not following orders as given, they are justified to use some force to secure compliance. *Moore-Jones v. Quick*, 909 F.3d 983, 986 (8th Cir. 2018). And *Moore-Jones* provides more specific parameters about when officers can use force against a non-compliant motorist. There, a non-violent misdemeanant failed to stop after an officer pulled out behind her and turned on his emergency lights. *Id*. at 985. The officer proceeded to pursue the suspect as she drove 35-38 mph on a road with a posted speed limit of 55 mph. *Id*. When they were about a mile and a half away from the nearest city, the officer believed he could stop the vehicle without putting the driver or others in danger, so he "began a Precision Immobilization Technique (PIT) maneuver" which involved striking the driver's "right-rear fender with his left-front bumper. *Id*. This caused the driver's "car to spin into a ditch, hitting a cement culvert." *Id*. at 985-86. The driver and her daughter were treated and released from the hospital that same evening. *Id*.

The driver brought a Fourth Amendment excessive force claim, and the question in front of the court was whether her right to be free from a PIT maneuver was clearly established in these circumstances. *Id*. at 986. The court held that since the reasonableness of the officer's actions was *not* beyond debate, the driver's right to be free from the PIT was *not* clearly established in these circumstances, and the officer was entitled to qualified immunity. *Id*. at 986-87. In reaching this decision, the court cited numerous cases in which officers' use of a PIT maneuver during the pursuit of a fleeing suspect was held to be reasonable, including a case where no other vehicles or pedestrians were encountered during the pursuit. *Id*. Ultimately, the court held that the officer's

actions "were in the hazy border between excessive and acceptable force," entitling him to qualified immunity. *Id.*

Even taking as true the plaintiff's claim that Mr. Zutavern was driving the RAZR to turn himself in, it has been established that Trooper Trevino and Lieutenant Arnold were not required to read those motivations. Therefore, reasonable officers in these circumstances could have perceived Mr. Zutavern's decision to drive towards the ranch's entrance as an attempt to flee. In fact, according to the complaint, Mr. Zutavern stayed in the clubhouse for twelve hours and only jumped in the RAZR when law enforcement began approaching the clubhouse. Filing 1 at 9. And when his vehicle came "nose-to-nose" with the robot deployed by the LAV, he pulled away and headed toward the ranch's entrance. Filing 1 at 9. Although multiple police vehicles were following him at this point, Mr. Zutavern did not stop. *See* filing 1 at 10. Therefore, in these circumstances, a reasonable officer could have believed they were entitled to use *some* force to secure compliance. And existing precedent does not establish beyond debate that the force applied during the ram was unreasonable.

As in *Moore-Johnson*, Mr. Zutavern had not committed a serious crime, and it is not alleged that his speed or manner of driving posed any immediate risk to officers or bystanders. Still, the *Moore-Johnson* court held that it was not beyond debate whether the officer's decision to use a PIT maneuver in those circumstances violated the plaintiff's clearly established Fourth Amendment rights. And according to the plaintiff's facts, even less force was applied in the instant case. The plaintiff does not allege that the RAZR crashed, spun out of control, or even came to a stop when Trooper Trevino made contact. Instead, he alleges that immediately after the ram "[Mr. Zutavern] stayed on the RAZR and did not respond to the provocation." Filing 1 at 10.

In sum, it is not established beyond debate that Lieutenant Arnold and Trooper Trevino's decision to ram Mr. Zutavern in this situation was objectively unreasonable, or that the force used to carry out that decision was excessive in light of the circumstances. At best, their actions can be characterized as falling on the "hazy border between excessive and acceptable force," and in such situations, the plaintiff's failure to "identify a case where an officer acting under similar circumstances was held to have violated the Fourth Amendment is often fatal to a claim outside of obvious cases." *Moore-Johnson*, 909 F.3d at 985 (cleaned up). As Mr. Zutavern's right to be free from Lieutenant Arnold and Trooper Trevino's ramming maneuver in these circumstances was not clearly established, they are entitled to qualified immunity, and the plaintiff's Fourth Amendment claims against them are dismissed.

## 2. EIGHTH AMENDMENT

Next, the plaintiff claims that the conduct of the individual NSP defendants violated Mr. Zutavern's right to be free from excessive punishment and indifference to his psychiatric medical needs, filing 1 at 17, invoking the Eighth Amendment. *See Robinson v. Hager*, 292 F.3d 560, 563-64 (8th Cir. 2002) (holding that the Eighth Amendment's proscription against cruel and unusual punishment extends to "proscribe[] deliberate indifference to the serious medical needs of prisoners"). But the Eighth Amendment only applies to convicted prisoners. *Jackson v. Stair*, 944 F.3d 704, 709 (8th Cir. 2019); *Hott v. Hennepin Cnty.*, 260 F.3d 901, 905 (8th Cir. 2001). Since Mr. Zutavern was not a convicted prisoner at the time of the alleged violations, all Eighth Amendment claims against the NSP defendants are dismissed.

21

### 3. FOURTEENTH AMENDMENT

The plaintiff also claims that the actions of the individual NSP defendants violated Mr. Zutavern's rights to due process, equal protection, and bodily integrity under the Fourteenth Amendment. Filing 1 at 17. First, the Court will note that the Fourteenth Amendment is not the proper amendment under which to analyze the plaintiff's claim that Mr. Zutavern's "bodily integrity" was violated during his seizure. In essence, this amounts to an excessive force claim, and the Supreme Court has made it clear that "*all* claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment . . . rather than under a 'substantive due process' approach." *Graham v. Connor*, 490 U.S. 386, 395 (1989).

Additionally, none of the defendants' alleged conduct prior to the seizure meets the high bar required to establish a substantive due process violation. The touchstone of the substantive due process clause is protection from government power that is arbitrarily and oppressively exercised. *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 845-46 (1998). When evaluating the actions of law enforcement officers, "only the most egregious official conduct" that results from a brutal and inhumane abuse of official power can be said to violate the Fourteenth Amendment. *Id.*; *see White v. Smith*, 696 F.3d 740, 757-58 (8th Cir. 2012). In this way, "the Constitution does not guarantee due care on the part of state officials; liability for negligently inflicted harm is categorically beneath the threshold of constitutional due process." *Cnty. of Sacramento*, 523 U.S. at 845-46. Instead, "conduct intended to injure in some way unjustifiable by any government interest is the sort of official action most likely to rise to the conscience-shocking level." *Id.*

Even when viewing the facts in the light most favorable to the plaintiff, he has not alleged any pre-seizure conduct so egregious that it may fairly be said to shock the contemporary conscience. Though the size and scope of the operation to detain Mr. Zutavern may have been "comparable to a SWAT operation," filing 53 at 5, it cannot be said that this response was intended to harm Mr. Zutavern, or that it was arbitrary and unjustifiable by any government interest. Police responded to the ranch after Mr. Zutavern's parents requested their assistance, claiming that their son had access to firearms, had just shot two calves, and that there was "no reasoning with" him. Filing 1 at 7. And the plaintiff concedes that law enforcement's goal during the operation was to get Mr. Zutavern to a mental health provider. Filing 1 at 10. Though one could argue that the size and extensiveness of the response may not have been necessary given the circumstances, such allegations do not establish the kind of conscience-shocking police conduct that gives rise to a Fourteenth Amendment substantive due process claim.

Lastly, the plaintiff has also failed to allege an equal protection claim. "The purpose of the equal protection clause is to secure every person within the state's jurisdiction against intentional and arbitrary discrimination." *Robbins v. Becker*, 794 F.3d 988, 995 (8th Cir. 2015) (citations omitted). And to claim a denial of equal protection, the plaintiff must allege facts showing that Mr. Zutavern was similarly situated to others who received preferential treatment. *Id*. Where the complaint has failed to make any allegations that Mr. Zutavern was treated differently than similarly situated individuals, there is no viable equal protection claim. In sum, the facts do not support any theory of Fourteenth Amendment liability, and such claims against Trooper Mortenson, Sergeant Workman, Trooper Cockle, Lieutenant Arnold, and Trooper Trevino are dismissed.

4. CAPTAIN SCHMIDT

The Court will address the plaintiff's claims against Captain Schmidt separately, as this is how they are presented by the parties. *See* filing 53 at 6; filing 61. The plaintiff's complaint asserts multiple theories of liability against Captain Schmidt, including that he (1) failed to provide reasonable safety to Mr. Zutavern despite their special relationship, (2) acted with deliberate indifference to Mr. Zutavern's constitutional rights, (3) failed to provide adequate training and supervision to his subordinates during the standoff situation, and (4) enforced a policy or custom of poorly managing standoff situations with mentally ill subjects. *See* filing 1 at 17-18. However, the plaintiff's brief clarifies that his theory of liability against Captain Schmidt at this stage is actually *not* supervisory, but instead, "based on personal and direct involvement, *i.e.,* his directions and orders in his command of the standoff." Filing 53 at 6. As such, the Court will not analyze whether the plaintiff has established that Captain Schmidt failed to train or supervise his subordinates, or that he acted with deliberate indifference to their allegedly unconstitutional conduct, as these are theories of supervisory liability. *See Davis v. Buchanan Cnty.*, 11 F.4th 604, 624 (8th Cir. 2021); *Brockington v. City of Sherwood*, 503 F.3d 667, 673 (8th Cir. 2007).

Instead, the Court must analyze whether Captain Schmidt "directly participat[ed]" in the alleged constitutional violations to determine if the plaintiff has asserted a claim against him. *See Brockington*, 503 F.3d at 673. First, though Captain Schmidt was at the ranch and it is alleged that he led the standoff for several hours, there are no facts supporting the inference that he directly participated in the seizure of Mr. Zutavern. *See* filing 1 at 8-13. In fact, the plaintiff does not allege that Captain Schmidt was present at the ranch's entrance when Mr. Zutavern was allegedly seized, nor are there any

facts indicating that Captain Schmidt explicitly directed or authorized the ramming or shooting. And since the plaintiff is not alleging supervisory liability—in which case it would be relevant whether Captain Schmidt was deliberately indifferent to or tacitly authorized these acts—his mere proximity to the officers when they conducted the seizure is not enough to allege his direct participation and establish Fourth Amendment liability. Additionally, the plaintiff cannot claim that Captain Schmidt's conduct violated Mr. Zutavern's Eighth Amendment rights because, as stated above, Mr. Zutavern was not a convicted prisoner. Therefore, the plaintiff's Fourth and Eighth Amendment claims against Captain Schmidt are dismissed.

Still, the plaintiff attempts to establish Captain Schmidt's direct participation in a constitutional violation by asserting that, as the director of the standoff, he had a "special relationship" with Mr. Zutavern—as that term is understood under the Fourteenth Amendment—and directly violated the affirmative duty imposed on him by this relationship to protect Mr. Zutavern's life and safety. Filing 53 at 6-7. More specifically, the plaintiff argues that since Mr. Zutavern was not free to leave the ranch, protect himself, or do as he pleased during the standoff, he was in Captain Schmidt's custody, and therefore, in a special relationship with him. Filing 53 at 8. Conversely, Captain Schmidt argues that Mr. Zutavern was not in the "care, custody, or control" of law enforcement at the time he was shot. Filing 61 at 3.

But the Court need not address whether the plaintiff has sufficiently alleged that Mr. Zutavern was in state custody during the standoff because, even if the Court were to conclude that he was, Captain Schmidt is entitled to qualified immunity, as Mr. Zutavern's Fourteenth Amendment right to

protection and safety in this scenario was not clearly established.[5] The language of the Due Process Clause, while forbidding a state from depriving individuals of life, liberty, or property without due process of law, only imposes on the state an affirmative duty to protect or care for particular individuals in "limited circumstances." *Gregory v. Rogers*, 974 F.2d 1006, 1009-19 (8th Cir. 1992). One such circumstance in which this duty arises is "in custodial . . . settings." *Id*. However, custody in this context "must be something more than an individual's reasonable belief that he is not free to leave." *Gladden v. Richbourg*, 759 F.3d 960, 965 (8th Cir. 2014).

Instead, custody is effected only "[w]hen the State by the affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself." *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 200 (1989). In this circuit, it has been recognized that such custody exists—thereby imposing on the state an affirmative duty to provide medical care and reasonable safety—when an individual is incarcerated, *see Norfleet v. Ark. Dep't of Hum. Servs.*, 989 F.2d 289, 293 (8th Cir. 1993); when a child is placed into foster care, *id*.; and when an individual is involuntarily held in a state mental health facility, *see Shelton v. Ark. Dep't of Hum. Servs.*, 677 F.3d 837, 840 (8th Cir. 2012).

The plaintiff reasons that although Mr. Zutavern was not incarcerated or institutionalized, the standoff was consistent with a prison-like environment because Mr. Zutavern was not allowed to leave the clubhouse or move about the property. Filing 53 at 7. In fact, the minute Mr. Zutavern attempted to leave the clubhouse, he was followed and seized by a multitude

---

[5] Though Captain Schmidt does not raise a qualified immunity defense, the Court may raise the issue *sua sponte* where the defense is established on the face of the complaint. *See Story v. Foote*, 782 F.3d 968, 969-70 (8th Cir. 2015).

of armed officers. Filing 53 at 7. And this restriction on his freedom of movement allegedly prevented him from protecting himself from third-party attacks. Filing 53 at 7.

But even if the Court were to find that the plaintiff's facts establish that Mr. Zutavern was in custody, and therefore, in a special relationship with Captain Schmidt during the standoff, the plaintiff does not cite any cases where an individual was held to be in Fourteenth Amendment "custody" in similar circumstances. Therefore, the plaintiff has failed to meet his burden of proving that Mr. Zutavern's Fourteenth Amendment right to medical care and reasonable safety was clearly established in this situation. *See Wilson*, 901 F.3d at 986. Based on this circuit's precedent, the Court simply cannot conclude that a reasonable officer in Captain Schmidt's position would have known that Mr. Zutavern was in state custody for Fourteenth Amendment purposes during a standoff operation aimed at apprehending him. Therefore, Captain Schmidt is entitled to qualified immunity, and the plaintiff's Fourteenth Amendment claim against him is dismissed.

## IV. CONCLUSION

Though what happened to Mr. Zutavern is undoubtedly tragic, the plaintiff's complaint does not sufficiently establish a § 1983 claim against Trooper Mortenson, Sergeant Workman, Trooper Cockle, Lieutenant Arnold, Trooper Trevino, or Captain Schmidt. As such, the plaintiff's individual and official capacity claims against these defendants are dismissed.[6] But this

---

[6] The Court has reached this conclusion after considering all of the facts alleged in the plaintiff's responsive brief. *See generally* filing 53. Therefore, it finds that the plaintiff's request to amend his complaint to include these facts would be futile. *See* filing 53 at 6. For this reason, that request is denied.

action will proceed against the remaining defendants, including Trooper Wilkie in his individual capacity, as their liability has yet to be determined. Accordingly,

IT IS ORDERED

1. The defendants' motion to dismiss (filing 46) is granted.

2. The plaintiff's claims against Trooper Mortenson, Sergeant Workman, Trooper Cockle, Lieutenant Arnold, Trooper Trevino, and Captain Schmidt are dismissed, and they are terminated as parties.

3. The plaintiff's claims against Trooper Wilkie in his official capacity are dismissed.

Dated this 23rd day of August, 2022.

BY THE COURT:

John M. Gerrard
United States District Judge

28